**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**Cleveland Division**

| | | |
|---|---|---|
| MIRACLE CITY HOSPICE, LLC<br><br>Plaintiff,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES<br><br>Defendant. | ) | Civil Action No.: _______________ |

## COMPLAINT FOR JUDICIAL REVIEW

Plaintiff, Miracle City Hospice, LLC ("Miracle City"), by and through its undersigned legal counsel, hereby files this Complaint for Judicial Review against Defendant, Robert F. Kennedy, Jr., in his official capacity as the Secretary of the U.S. Department of Health and Human Services ("Secretary"), following the entry of an administrative order by the Medicare Appeals Council ("Council") as to Council docket number M-26-3408 and Office of Medicare Hearings and Appeals (OMHA) appeal number 3-14964737655, and in support thereof states as follows:

## PARTIES

1. Miracle City is a limited liability company organized under the laws of the State of Ohio. Miracle City's principal place of business is located at 9150 South Hills Boulevard, Suite 100, Broadview Heights, Ohio 44147.

2. Robert F. Kennedy, Jr. is the Secretary of the U.S. Department of Health and Human Services (HHS) and the proper Defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395ff(b)(1)(A) (incorporating by reference 42 U.S.C. § 405(g)), which authorizes judicial review of the Secretary's final decision as to a Medicare reimbursement dispute such as this.

4. Venue is proper pursuant to 42 U.S.C. § 1395ff(b)(1)(A) because Miracle City's principal place of business is located in this judicial district.

5. The amount in controversy exceeds the jurisdictional requirement set forth at 42 U.S.C. § 1395ff(b)(1)(E)(i).

6. This action has been initiated within 60 days of the Council's administrative order dated September 18, 2026, as required by 42 C.F.R. § 405.1132(b).

## ADMINISTRATION OF THE MEDICARE PROGRAM

7. Medicare is the federal health insurance program for the elderly and disabled established in 1965. The Medicare statute is codified at 42 U.S.C. § 1395 *et seq.*

8. The Medicare program is administered by the Centers for Medicare and Medicaid Services (CMS), which is an agency within HHS.

9. CMS engages with numerous private contractors to assist in the administration of the Medicare program. The types of contractors relevant to this matter include Medicare Administrative Contractors (MACs), Supplemental Medical Review Contractors (SMRCs), and Qualified Independent Contractors (QICs).

10. MACs perform numerous functions on behalf of CMS, including but not limited to claims processing, beneficiary and provider enrollment, adjudication of administrative claim appeals, development of local Medicare policies, and provider outreach and education. *See* 42 U.S.C. § 1395kk-1(a)(4).

11. SMRCs perform medical review audits of providers' claims on a post-payment basis to ensure those claims met all Medicare requirements for coverage and payment at the time they were submitted. *See id.* § 1395ddd(a)-(b).

12. QICs conduct administrative claim appeals on behalf of CMS. *See id.* § 1395ff(c).

13. Each CMS contractor is responsible for overseeing or assisting with Medicare program operations in a dedicated geographic area of the country. For example, the MAC with "jurisdiction" over hospice providers in Ohio, like Miracle City, is Palmetto GBA ("Palmetto").

**MEDICARE COVERAGE OF HOSPICE SERVICES**

14. CMS explains the purpose and goals of hospice care as follows:

> Hospice care is an approach to caring for the terminally ill individual that provides palliative care rather than traditional medical care and curative treatment. Palliative care is an approach that improves the quality of life of patients and their families facing the problems associated with life-threatening illness through the prevention and relief of suffering by means of early identification, assessment and treatment of pain and other issues. Hospice care allows the patient to remain at home as long as possible by providing support to the patient and family, and by keeping the patient as comfortable as possible while maintaining his or her dignity and quality of life.

Medicare and Medicaid Programs; Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32088 (June 5, 2008).

15. Medicare covers reasonable and necessary hospice services furnished to eligible beneficiaries. To qualify for the Medicare hospice benefit, a beneficiary must elect to receive hospice care and be certified as terminally ill by a physician. 42 C.F.R. § 418.20.

16. An individual is considered "terminally ill" when he or she has a life expectancy of six months or less if the illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A).

17. Medicare defines the term "hospice services" to include all services, medications, and equipment necessary for the palliation and management of a terminal condition. Hospice

services may include, but are not limited to, physician services, nursing care, medical social services, spiritual counseling services, short-term inpatient care, and physical, occupational, and speech therapy. *See id.* § 1395x(dd)(1); *see also* 42 C.F.R. § 418.3. As a condition of participation in the Medicare program, hospice providers are required to render "effective" pain management and symptom control to their patients. 42 C.F.R. § 418.52(c)(1).

18. Once a beneficiary elects to receive hospice services, the hospice provider's medical director (and the beneficiary's attending physician, when so designated) must certify that the beneficiary is terminally ill.[1] The certification is based on the medical director's or physician's clinical judgment regarding the normal course of the patient's illness. 42 U.S.C. § 1395f(a)(7)(A).

19. Each hospice certification covers a designated benefit period. Beneficiaries are entitled to receive hospice services through two consecutive 90-day benefit periods followed by an unlimited number of 60-day benefit periods. *Id.* § 1395f(a)(7)(A). The hospice medical director and beneficiary's attending physician, if one has been designated, must execute a certification at the beginning of each benefit period.[2] *Id.*

20. Certifications must conform to various content and timeliness requirements established by CMS. Relevant here, the written certification must include a brief narrative explanation of the clinical facts that support the beneficiary's terminal prognosis. 42 C.F.R. § 418.22(b)(3).

---

[1] A beneficiary's "attending physician" is the physician, nurse practitioner, or physician assistant whom the beneficiary identifies as having the most significant role in the determination and delivery of medical care at the time the beneficiary makes an election to receive hospice care. 42 U.S.C. § 1395x(dd)(3)(B). Beneficiaries are permitted, but not required, to designate attending physicians when they elect hospice.

[2] The medical director and the beneficiary's attending physician must both execute the certification covering the first benefit period. The Medicare statute and CMS regulations only require the hospice medical director to execute each certification thereafter, although the beneficiary's attending physician may also participate in the subsequent certification processes. 42 U.S.C. § 1395f(a)(7)(A)(ii).

21. For each recertification period, the hospice must obtain oral or written certification from the hospice physician 15 days prior to the beginning of the recertification period or 2 days after the recertification period starts. Each recertification must also include a brief clinical narrative statement composed by the hospice physician that supports the beneficiary's terminal prognosis. *Id.* § 418.22(b)(3).

22. The Medicare statute and CMS regulations expressly recognize the pivotal role played by the hospice physician's clinical judgment with respect to hospice patient eligibility determinations. 42 U.S.C. § 1395f(a)(7)(A)(i); 42 C.F.R. § 418.22(b). In recognition of the centrality of the hospice physician's discretion and clinical judgment to the patient eligibility determination process, CMS has previously considered and expressly declined to create specific criteria that would govern or constrain that clinical judgment. *See* Medicare and Medicaid Programs: Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32138 (June 5, 2008).

23. Beginning with the third benefit period and continuing for each benefit period thereafter, a hospice physician or hospice nurse practitioner must conduct a face-to-face encounter to assess the beneficiary and gather clinical evidence relevant to the beneficiary's terminal condition. 42 U.S.C. § 1395f(a)(7)(D).

24. The only beneficiary eligibility requirement for hospice services set forth in the Medicare statute and CMS regulations is that the beneficiary be terminally ill with a life expectancy of six months or less if the illness runs its normal course. *See id.* § 1395x(dd)(1); 42 C.F.R. § 418.20.

25. CMS does not require that beneficiaries exhibit rapid decline in their conditions, unstable medical problems, or uncontrolled symptoms to be eligible for the Medicare hospice benefit. *See* Medicare Program; Hospice Wage Index for Fiscal Year 2010, 74 Fed. Reg. 39384,

39399 (Aug. 6, 2009) ("We acknowledge that not all patients will show measurable decline at the time of recertification.").[3]

26. In fact, CMS has acknowledged that a beneficiary can remain eligible for the Medicare hospice benefit if his or her condition is stable or even improves while receiving hospice care. Medicare Program; FY 2015 Hospice Wage Index and Payment Rate Update; Hospice Quality Reporting Requirements and Process of Appeals for Part D Payments for Drugs for Beneficiaries Enrolled in Hospice, 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014) (patient may, in view of "full clinical picture," be eligible for hospice even if his or her condition has stabilized or improved); Medicare Program; Home Health Prospective Payment System Rate Update for Calendar Year 2011; Changes in Certification Requirements for Home Health Agencies and Hospices, 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010) ("A patient's condition may temporarily improve with hospice care.").

27. Both Congress and CMS have recognized the inherent difficulty in prognosticating life expectancy. *See* Medicare Benefit Policy Manual ("MBPM") Ch. 9 § 10 (CMS IOM Pub. 100-02, Rev. 246) (2018) ("Predicting life expectancy is not always exact."); 79 Fed. Reg. at 50470 ("[W]e also have recognized the challenges in prognostication" and therefore expect "that the certifying physicians will use their best clinical judgment."); Medicare Program; Hospice Care Amendments, 67 Fed. Reg. 70363, 70364 (Nov. 22, 2002) (noting that Congress removed the 210-day hospice benefit period cap originally enacted in 1982 due to "the scientific difficulty in making a prognosis of six months or less."). The fact that a beneficiary lives longer than expected is not in itself cause to terminate hospice benefits. MBPM Ch. 9 § 10.

[3] Palmetto, the MAC whose jurisdiction includes Ohio, has similarly released guidance to the hospice stakeholder community confirming that there is, "[N]o requirement that 'significant documented decline' must be included in the record [to substantiate Medicare coverage of hospice services].''). Palmetto GBA, *Hospice Coalition Questions and Answers*, at 3–4 (Sept. 23, 2008), *available at* https://www.yumpu.com/en/document/read/41131953/september-23-2008-hospice-coalition-questions-palmetto-gba/3 (last accessed November 11, 2026).

28. CMS has developed various sub-regulatory guidance documents, such as the MBPM, that elaborate on and clarify coverage and payment rules set forth in Medicare regulations.

29. MACs also create Medicare coverage policies on behalf of CMS. These documents are called Local Coverage Determinations ("LCDs"). LCDs are guidance documents respecting whether a particular service or item is considered medically reasonable and necessary within the MAC's jurisdiction.[4] 42 U.S.C. § 1395ff(f)(2)(B).

30. Palmetto has promulgated several LCDs that are relevant to the hospice services furnished to the beneficiaries whose claims are at issue in this case, including L34547 ("Hospice – Neurological Conditions"), L34548 ("Hospice – Cardiopulmonary Conditions"), and L34567 ("Hospice – Alzheimer's Disease and Related Disorders"). These LCDs set forth guidelines for hospice providers to utilize in determining and documenting whether a beneficiary is terminally ill.

31. The LCDs relevant to this case contain recommended guidelines for establishing medical necessity of hospice services, as evidenced by the MAC's use of words such as "should" and "may," as opposed to mandatory language such as "shall" and "must."

32. For example, L34567 states in relevant part: "Alzheimer's Disease (AD) and related disorders may support a prognosis of six months or less under many clinical scenarios. The identification of specific structural/functional impairments, together with any relevant activity limitations, ***should*** serve as the basis for palliative interventions and care planning." L34567 at 3 (emphasis added). The LCD goes on to provide that, "Ultimately, the combined effects of the AD…and any comorbid [or secondary] condition ***should*** be such that ***most***

---

[4] Some provisions of the Medicare statute use the outdated terms "fiscal intermediary" and "carrier," which were the predecessor entities to MACs.

beneficiaries with AD…and similar impairments would have a prognosis of 6 months or less." L34567 at 4 (emphasis added). The LCD then concludes: "For beneficiaries with AD to be eligible for hospice, the individual ***should*** have [advanced Alzheimer's Disease] and specific comorbid or secondary conditions meeting the above criteria." *Id.* (emphasis added). L34547 and L34548 contain similarly permissive language.

33. The LCDs reference various evidence-based prognostic tools for hospice providers to use when documenting patient eligibility. For example, L34567 incorporates the Reisberg Functional Assessment Staging Tool ("FAST") scale, which healthcare providers use to objectively assess the progression of Alzheimer's Disease.[5] The FAST scale includes alphanumeric scores from 1 to 7F that correlate with various degrees of cognitive and functional decline. A score of 1 represents an individual with normal cognitive capabilities, whereas a score of 7A, for example, represents an individual with severe cognitive and functional impairments. These impairments include bowel and bladder incontinence, the need for assistance to complete basic self-care tasks such as bathing and dressing, and an inability to communicate more than 5-6 intelligible words per day. 7F is the lowest possible score on the FAST scale.

34. The FAST scale is only validated as a prognostic tool for hospice patients suffering from end-stage Alzheimer's Disease.[6] The LCD itself acknowledges this fact when it states, "The [FAST] scale has been used for many years to describe ***Medicare beneficiaries with AD*** and a prognosis of 6 months or less." L34567 at 3 (emphasis added). Therefore, FAST scores are not prognostically dispositive for beneficiaries suffering from non-Alzheimer's dementias.

---

[5] *See generally* Sclan, S.G. & Reisberg, B., *Functional Assessment Staging (FAST) in Alzheimer's Disease: Reliability, Validity, and Ordinality*, 4 INT'L PSYCHOGERIATRICS 55, 55–69 (1992).

[6] *Id.*

35. The LCDs are one path to documenting and establishing beneficiary eligibility for hospice services. As each LCD relevant to this case acknowledges, a beneficiary can be eligible for hospice services based on a certain condition or diagnosis "under many clinical scenarios."

36. A beneficiary is discharged from hospice when he or she passes away, revokes the election to receive hospice care (if, for example, he or she wishes to pursue curative treatment for the terminal illness), wishes to transfer to a different hospice provider, or moves outside of the hospice's designated service area. 42 C.F.R. § 418.26.

37. A beneficiary may transfer to a different hospice provider by filing a statement with the newly-designated hospice that includes the name of the hospice from which the beneficiary transfers and the effective date of the transfer. *Id.* § 418.30. CMS regulations and guidance otherwise do not establish any specific content or timeliness requirements for documentation of hospice transfers. *See id.*; *see also* MBPM Ch. 9 § 20.2.1.

38. Although hospice physicians must execute certifications covering benefit periods that are 90 days and 60 days in length, CMS requires that claims for hospice services be billed in monthly increments. Medicare Claims Processing Manual ("MCPM") Ch. 11 § 90 (CMS IOM Pub. 100-04, Rev. 3502) (2016).[7]

**MEDICARE CLAIM AUDITS AND APPEALS**

39. In the event a CMS contractor, such as a SMRC, denies a Medicare claim on a post-payment basis, then the provider is responsible for repaying any overpayment associated with the denied claim(s).

40. Providers who are dissatisfied with an adverse claim determination may contest that decision through a four-step administrative appeals process. *See* 42 U.S.C. § 1395ff(b).

---

[7] For example, if Ms. Smith elected hospice care on April 20 and lived through at least the month of May, the hospice's first Medicare claim would cover dates of service from April 20 to April 30. The hospice's next claim would then include dates of service May 1 through May 31.

41. The four steps in CMS' administrative claim appeal process are redetermination, reconsideration, a hearing before an ALJ, and review by the Council.

42. Requests for redetermination are processed by MACs. Requests for reconsideration are handled by QICs. Hearing requests are adjudicated by ALJs within OMHA. The Council often, but not always, renders final decisions concerning Medicare reimbursement disputes on behalf of the Secretary.

43. A redetermination consists of an independent review of an initial claim determination. During the redetermination process, the MAC reviews the evidence and findings upon which the initial determination was based along with any additional evidence submitted by the provider. The MAC then issues a decision affirming or reversing (in whole or in part), the initial determination in question. 42 C.F.R. §§ 405.948, 405.954. A provider that is dissatisfied with a redetermination decision may seek review of that decision by the QIC.

44. A reconsideration consists of an independent review of an initial determination and redetermination. The QIC will review the evidence and findings upon which the initial determination and redetermination were based along with any additional evidence submitted by the provider. The QIC's decision must contain, among other things, an explanation of how pertinent laws, rules, and regulations apply to the case as well as the medical and/or scientific rationale for the decision. *Id.* §§ 405.968(a)(1), 405.976(b). A provider that is dissatisfied with a reconsideration decision may seek review of that decision by an ALJ.

45. The ALJ hearing is the provider's only opportunity to present its case in real time to an adjudicator. ALJ hearings are usually conducted via telephone. The provider may present written statements about the facts and law relevant to the case, offer witness testimony, and make arguments regarding the issues in the case. *Id.* §§ 405.1020(b)(2), 405.1032(a), 405.1036(a)-(e);

*see also* Medicare Program: Changes to the Medicare Claims and Entitlement, Medicare Advantage Organization Determination, and Medicare Drug Coverage Determination Appeals Procedures, 82 Fed. Reg. 4974, 5049 (Jan. 17, 2017) ("A primary function of the ALJ hearing is to allow the parties to present arguments and testimony, and to allow the ALJ to ask questions in order to provide the ALJ with the necessary information to make the findings of fact and conclusions of law in rendering a decision consistent with the applicable authorities.").

46. ALJs review cases *de novo*. ALJs are not bound by CMS sub-regulatory guidance documents or LCDs but may give substantial deference to those policies in cases where they are applicable. *Id.* §§ 405.1000(d), 405.1062(a). If an ALJ declines to follow a particular policy, he or she must explain the reasons why in the decision. *Id.* § 405.1062(b).

47. The administrative record before the ALJ consists of all evidence used in the initial determination, redetermination, and reconsideration processes as well as the evidence offered at the hearing or otherwise admitted into the record by the ALJ. Hearing decisions must contain, among other things, independent findings of fact and conclusions of law. *Id.* §§ 405.1042, 405.1046(a)(1). A provider that is dissatisfied with an ALJ's decision may seek further administrative review by the Council.

48. The Council is responsible for conducting *de novo* reviews of ALJ decisions. The Council is generally required to issue a decision within 90 days of receiving a request for review. 42 U.S.C. § 1395ff(d)(2). In the event the Council is unable to adjudicate an appeal within 90 days of receipt, the provider may file a request to "escalate" its appeal to federal district court. Within five days of receiving a provider's escalation request, the Council must either render a decision or confirm it is unable to issue a decision and permit the provider to seek review in federal court. *Id.* § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132.

49. In a case where a provider escalates an appeal pending before the Council to federal district court, the ALJ's decision becomes the Secretary's final decision for purposes of judicial review. *See, e.g.*, *Ashli Healthcare, Inc. v. Becerra*, 2024 WL 3890104, at *1 (E.D. Cal. Aug. 21, 2024).

**LIABILITY FOR NON-COVERED SERVICES AND WAIVER OF OVERPAYMENTS UNDER THE MEDICARE STATUTE**

50. The Medicare statute contains special rules for evaluating whether a provider should be financially liable for non-covered services or if recoupment of an overpayment from the provider can be waived.

51. The law allows for limitation on a provider's liability for an alleged Medicare overpayment in cases where the provider did not know, nor could it reasonably have been expected to know, that payment would not be made for the denied services. This statutory limitation on liability applies where services have been denied because they were not medically reasonable and necessary. 42 U.S.C. § 1395pp(a)(1).

52. CMS regulations and guidance contain various criteria to apply when evaluating whether a provider's liability should be limited in connection with non-covered services. The applicable regulation requires analysis of the following:

> [Whether] [i]t is ***clear*** that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following: [i]ts receipt of CMS notices, including manual issuances, bulletins, or other written guidelines or directives from intermediaries, carriers…; Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service; or [i]ts knowledge of what are considered acceptable standards of practice by the local medical community.

42 C.F.R. § 411.406(e) (emphasis added). The MCPM similarly provides that, "When the medical records ***clearly*** show that the beneficiary received only non-covered services as described in the Medicare Benefit Policy Manual, the healthcare provider or supplier will be

presumed to have knowledge of non-coverage." MCPM Ch. 30 § 30.2.2 (Pub. 100-04, Rev. 4197) (2019) (emphasis added).

53. Waiver of liability under 42 U.S.C. § 1395pp is appropriate where the meaning of a particular coverage standard is "far from obvious or obviously correct" or CMS has applied an "improper standard" in its coverage decisions. *See Caring Hearts Pers. Home Servs. v. Burwell*, 824 F.3d 968, 972 (10th Cir. 2016) (Gorsuch, J.); *Cypress Home Care, Inc. v. Azar*, 326 F.Supp.3d 307, 316 (E.D. Tex. 2018).

54. The Medicare statute also allows for waiver of recovery of an overpayment to a provider in cases where the provider was "without fault" with respect to the creation of the overpayment. 42 U.S.C. § 1395gg(b); *see also* 42 C.F.R. § 405.355(a); Medicare Financial Management Manual ("MFMM") Ch. 3 § 70.3 (Pub. 100-06, Rev. 294) (2017). Overpayments assessed for any reason— not just those based on an alleged lack of medical necessity—are subject to waiver under 42 U.S.C. § 1395gg(b).

55. The MFMM offers several examples of situations in which providers will be at fault for causing an overpayment, such as where the provider received Medicare payment for services that the provider should have known were non-covered. MFMM Ch. 3 § 90.1(H).

56. The MFMM incorporates by reference the criteria set forth in Chapter 30 of the MCPM for determining when a provider knew or should have known that certain items or services would be non-covered. MFMM Ch. 3 § 90.1(H)(2). The constructive knowledge standards for determinations under 42 U.S.C. §§ 1395pp and 1395gg(b) are thus, in effect, identical.

**<u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

57. At all times relevant hereto, Miracle City was a Medicare-certified provider of

hospice services. Miracle City provides high-quality hospice services to the residents of the greater Cleveland, Ohio area, many of whom are Medicare beneficiaries.

58. At all times relevant hereto, Noridian Healthcare Solutions, LLC ("Noridian") was a SMRC operating under contract with CMS.

59. In August 2023, Noridian provided notice of its intent to conduct a post-payment audit of certain hospice services billed by Miracle City to the Medicare program between 2021 and 2023. The audit covered approximately 200 claims for services rendered to 15 different Medicare beneficiaries. Miracle City submitted copies of its medical records to the SMRC as requested.

60. In January 2024, Noridian sent a letter to Miracle City alleging that approximately 51% of the claims under review failed to meet Medicare coverage criteria and should not have been reimbursed. The SMRC further asserted that Miracle City had received Medicare overpayments totaling $465,529.

61. Upon receipt of the initial overpayment determination, Miracle City promptly filed a request for redetermination with Palmetto in May 2024. In a partially favorable notice of redetermination dated July 23, 2024, the MAC reversed one unfavorable claim determination but otherwise agreed with Noridian's overpayment findings.

62. Miracle City then sought reconsideration with the responsible QIC, Maximus Federal Services, Inc. ("Maximus"). On or around February 25, 2025, Maximus rendered a partially favorable reconsideration decision that reversed three claim denials and upheld the remaining unfavorable determinations.

63. On April 24, 2025, Miracle City requested a hearing before an ALJ to challenge the unfavorable aspects of the QIC's reconsidered determination.

64. The ALJ to whom the case was assigned held an evidentiary hearing by telephone on September 23, 2025. Miracle City was represented by counsel and presented legal arguments along with clinical testimony from Dr. Ruth Thomson, who is board-certified in hospice and palliative medicine and holds a hospice medical director credential.

65. Two physicians participated on behalf of the CMS contractor, Noridian, and testified as to why they believed the claims under review did not meet Medicare coverage guidelines.

66. On March 10, 2026, the ALJ issued a partially favorable decision. The ALJ reversed six claim denials for two beneficiaries but otherwise affirmed the remaining unfavorable aspects of the QIC's reconsidered determination on the bases that: (1) the documentation did not support that the beneficiaries were terminally ill with life expectancies of six months or less during the relevant dates of service; (2) the documentation in one case did not support the beneficiary's transfer to Miracle City pursuant to 42 C.F.R. § 418.30; and (3) Miracle City knew or should have known the services under review were not covered by Medicare.[8]

67. Federal regulations require ALJs to render decisions based upon evidence offered at the hearing or otherwise admitted into the record. 42 C.F.R. § 405.1046(a)(1). Although the ALJ summarized the testimony offered by Dr. Thomson during the hearing, he never explained why he rejected that testimony as not relevant or credible. Federal agency adjudicators are not required to address each piece of evidence in a record when issuing a decision, but the testimony offered by Miracle City's expert witness was central to its case given the importance of the physician's clinical judgment in assessing beneficiary eligibility for hospice services under the Medicare statute. 42 U.S.C. § 1395f(a)(7)(A)(i); *see also Seasons Hospice & Palliative Care of*

[8] The ALJ also dismissed part of Miracle City's appeal as to certain claims based upon Miracle City's request. *See* 42 C.F.R. § 405.1052(c). The dismissed claims are not at issue in this Complaint.

*Del., LLC v. Kennedy*, 2025 WL 2174863, at *4-5 (D. Del. July 31, 2025) (reversing unfavorable ALJ decision due to ALJ's failure to adequately explain reasons for rejecting hospice physician's medical opinion); *Hospice of E. Tex. v. Sec'y. of U.S. Dep't. of Health and Hum. Servs.*, 2025 WL 1062504, at *23-24 (E.D. Tex. Feb. 21, 2025) (same).

68. The ALJ also applied the wrong LCD to the claims under review. In the section of his decision entitled "Applicable Law and Policy," the ALJ incorporated lengthy citations from LCD L33393. That LCD was not issued by Palmetto but rather a different contractor whose jurisdiction does not include the state of Ohio. *Cf.* 42 U.S.C. § 1395ff(f)(2)(B) (LCDs are coverage policies that apply on a *contractor-wide* basis).

69. The ALJ specifically cited L33393 as a basis for his unfavorable determination in the case of beneficiary J.M. and found that the documentation did not establish the criteria set forth in L3393 were met. That LCD was not applicable to beneficiary J.M.'s case.

70. The ALJ also misapplied the pertinent LCDs to the claims under review. For example, beneficiaries P.B. and D.L. suffered from end-stage dementia. The guidelines set forth in L34567 would therefore be relevant. The primary basis articulated by the ALJ for the denial of claims for those beneficiaries was that the documentation did not support they had FAST scores of 7A or lower during the dates of service. As previously noted, however, the FAST scale is only prognostically relevant for beneficiaries suffering from Alzheimer's Disease.

71. In the case of beneficiary R.A., who suffered from terminal Alzheimer's Disease, the ALJ denied Medicare coverage because R.A. did not have a FAST score of 7A or lower. The LCD, however, does not establish this as an absolute eligibility requirement for hospice services. L34547 states: "For beneficiaries with [Alzheimer's Disease] to be eligible for hospice, the individual ***should*** have a FAST level of greater than or equal to 7 and specific comorbid or

secondary conditions meeting the above criteria." L34547 (emphasis added). *Cf. Albert v. Burwell*, 118 F.Supp.3d 505 (E.D. N.Y. 2015) (reversing unfavorable Medicare coverage decision because the Council improperly applied permissive LCD criteria).

72. The ALJ agreed with the denial of the claims for beneficiaries D.L., A.F., and B.C., at least in part because the beneficiaries' conditions were purportedly stable and there was no evidence of uncontrolled comorbid medical conditions. These are not requirements for Medicare to cover hospice services. *See* 79 Fed. Reg. at 50471 (patients can be stable and still eligible for hospice care); 75 Fed. Reg. at 70448 (patients' conditions can improve while receiving hospice); 74 Fed. Reg. at 39399 (measurable decline not required); *see also* Palmetto GBA, *Hospice Coalition Questions and Answers*, at 3-4 ("significant documented decline" not required).

73. The issues summarized in the preceding paragraphs are reasonably representative of the flaws that permeate the ALJ's decision.

74. Following his analysis of the claims under review, the ALJ found that Miracle City did not qualify for a limitation or waiver of liability under the relevant provisions of the Medicare statute.

75. With respect to liability under 42 U.S.C. § 1395pp, the ALJ stated that Miracle City was presumed to have knowledge of Medicare coverage criteria as set forth in various statutes, regulations, agency rulings, and guidance documents. The ALJ concluded that Miracle City "…knew or reasonably should have known that Medicare likely would not cover the services. Therefore, [Miracle City] is liable for the non-covered charges."

76. The ALJ's analysis as to Miracle City's liability under 42 U.S.C. § 1395pp is flawed because, among other reasons, constructive knowledge alone is insufficient to defeat such

a claim for limitation of liability. If that was the case, then no Medicare provider would ever qualify for such a limitation because all providers are charged with constructive knowledge of the relevant laws, rules, and regulations.

77. The ALJ also found that recoupment of the overpayment could not be waived pursuant to 42 U.S.C. § 1395gg(b) because Miracle City "should have known documentation did not support the services at issue were not medically reasonable and necessary for the beneficiaries."

78. Because the knowledge standards used for liability determinations under 42 U.S.C. §§ 1395pp and 1395gg(b) are the same, the ALJ's waiver analysis is also indelibly flawed. For example, the ALJ failed to consider whether it was *reasonable* for Miracle City to believe that the services rendered were reasonable and necessary under the applicable coverage standards. *See In Home Health, LLC v. Kennedy*, 184 F.4th 499, 509 (6th Cir. 2026).

79. The ALJ's analysis of Miracle City's liability under 42 U.S.C. §§ 1395pp and 1395gg(b) is largely the same as that in the ALJ decision that was reversed by the Sixth Circuit in *In Home Health. See id.* at 509-510.

80. On May 8, 2026, Miracle City filed a request for the Council to review the ALJ's decision.

81. On September 10, 2026, Miracle City submitted a request to the Council to escalate its pending appeal to federal district court.

82. On September 18, 2026, the Council issued an administrative order confirming that it was unable to timely adjudicate Miracle City's request for review. The Council's order confirmed that Miracle City was entitled to escalate its appeal to federal court.

83. The ALJ's decision is the final agency decision in this matter pursuant to 42

U.S.C. § 1395ff(b)(1)(A). Miracle City has thus exhausted its administrative remedies, and this case is eligible for judicial review.

**COUNT I – INCORRECT LEGAL STANDARDS**

84. Miracle City hereby incorporates by reference paragraphs 1 through 83 herein.

85. The ALJ has not correctly applied the relevant legal standards governing Medicare coverage of hospice services and liability for non-covered services under the relevant provisions of the Medicare statute.

86. The ALJ's coverage determinations are, as a general matter, legally erroneous because they do not accord sufficient weight to the clinical judgment exercised by the certifying hospice physicians or the expert testimony of Dr. Thomson.

87. The ALJ did not correctly apply the relevant LCDs to the claims under review because he treated those permissive coverage guidelines as though they were mandatory and binding in nature.

88. The ALJ improperly considered the criteria in L33393 when analyzing the claims under review even though that LCD does not apply to hospice providers in Ohio.

89. The ALJ's analysis as to Miracle City's liability under the relevant provisions of the Medicare statute was flawed because he incorrectly believed that constructive knowledge of Medicare coverage guidelines by itself was sufficient to defeat claims for a limitation or waiver of liability. The ALJ also failed to consider whether Miracle City's interpretation and/or application of the relevant coverage standards was reasonable as to each claim under appeal. *Cf. In Home Health*, 184 F.4th at 509-10.

**COUNT II – LACK OF SUBSTANTIAL EVIDENCE**

90. Miracle City hereby incorporates by reference paragraphs 1 through 89 herein.

91. The ALJ's coverage decisions are unsupported by substantial evidence because the medical records establish that the beneficiaries were terminally ill in that their life expectancies were six months or less if their illnesses ran the normal course.

92. No reasonable mind would accept the evidence cited by the ALJ in his unfavorable coverage decisions as sufficient to support the conclusion that the corresponding hospice claims are not covered by Medicare.

93. In reaching his unfavorable coverage determinations, the ALJ failed to appropriately consider evidence that fairly detracted from his decisions.

## PRAYER FOR RELIEF

WHEREFORE, Miracle City respectfully requests that this Court:

94. Reverse the ALJ's decisions that Medicare does not cover the hospice services under review.

95. Reverse the ALJ's determination that Miracle City does not qualify for limitation or waiver of liability for any non-covered services pursuant to the applicable sections of the Medicare statute.

96. Award to Miracle City all costs, damages, and attorneys' fees allowed under applicable law.

97. Grant to Miracle City any other legal or equitable relief that the Court may deem just and proper.

Respectfully Submitted,

Dated: November 17, 2026

*/s/ Andrew B. Barras*
Andrew B. Barras (0088600)
**KEATING MUETHING & KLEKAMP PLL**
One East Fourth Street, Suite 1400
Cincinnati, OH 45202

Tel: (513) 579-6540
Fax: (513) 579-6457
abarras@kmklaw.com

Adam L. Bird (*pro hac vice* application forthcoming)
D.C. Bar No. 1005485
**CALHOUN BHELLA LLP**
2121 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20007
Tel: (202) 804-6031
Fax: (214) 981-9203
abird@calhounbhella.com

**Attorneys for Miracle City Hospice, LLC**